140 So.2d 467 (1962)
CENTRAL LOUISIANA ELECTRIC CO., Inc., Plaintiff-Appellant,
v.
Louise Badeaux MIRE et al., Defendants-Appellees.
No. 5291.
Court of Appeal of Louisiana, First Circuit.
March 14, 1962.
Rehearing Denied April 23, 1962.
*468 Landry, Watkins, Cousin & Bonin, by Jack Cousin, New Iberia, for appellant.
Philip E. Pfeffer, Covington, for appellees.
Before ELLIS, HERGET and MILLER, JJ.
MILLER, Judge pro tem.
This expropriation suit was instituted May 4, 1959, by plaintiff, Central Louisiana Electric Co., Inc., against defendants, Louise Badeaux Mire, Miriam Marie Mire Camp, Louis Noel Mire, George A. Mire, Jr., Janice Ann Mire, Elaine Carol Mire, Joan Elise Mire Hisler, and Marilyn Clare Mire Pittman, to acquire a 4.5 acre servitude or right-of-way for construction of an electrical transmission and service line. The only issues presented are: (1) the amount of damages to be awarded, and (2) *469 what amount of damages, if any, should be awarded for a trespass committed when agents of the plaintiff went on defendant's property without permission.
The line proposed to be constructed by plaintiff will extend from a point approximately two miles northwest of the Town of Madisonville to the Town of Mandeville, in St. Tammany Parish, Louisiana, and is necessary to properly serve the increasing demands for electricity throughout St. Tammany Parish and particularly in the Town of Mandeville. The easement is required for erection of a double circuit 34,500 volt transmission service with a distribution underbuild. This distribution underbuild will first be installed as a 2,400 volt two wire service to take over the existing 2,400 volt distribution service, but will later be changed out to provide a 15,000 volt distribution service.
The required servitude is to be maintained by completely clearing all trees and is to have a width of 50 feet on either side of the centerline or a total of 100 feet where the line traverses defendants' property and as little as 49 feet where defendants' land parallels the highway and the poles are to be erected alongside defendants' property. The line is to be constructed of single wood poles except that two poles and three guy wires will be used where the line makes an angle. The poles will stand about 47 feet above the ground and approximately 400 feet apart and the lowest wires will hang about 19 feet above the ground. This line is to be identical to the line presently existing in front of numerous commercial establishments on Florida Street in Mandeville.
The district court rendered judgment granting the required servitude to the plaintiff upon the payment to defendants of $8,000.00. Three thousand dollars was awarded as compensation for the servitude and an award of five thousand dollars was made for severance damages to defendants' valuable country estate which is hereinafter sometimes referred to as the "home place property." By this appeal, plaintiff-appellant challenges the correctness of the awards made on the grounds that such awards were excessive and not in accordance with law. Defendants-appellees have answered the appeal contending that the award was inadequate and should be increased.
The property is located on a paved highway, Louisiana Highway 22, about one-half mile east of the Tchefuncta River at Madisonville and about two and one-half miles west of the intersection of Louisiana Highway 22 and the west approach to the New Orleans Causeway. Defendants contend that their entire 145 acre tract which appears to us to be made up of some 135 acres of swamp land and 10 acres of highland will be damaged by the right of way and the highline, whereas plaintiff contends that defendants have not proven their title to the adjoining lands, and even if the adjacent lands do belong to the defendants, the properties are used for different purposes, and therefore there can be no severance damages awarded. While it is true that neither party had introduced any deed in the record showing title to any of the property in question, we find in evidence plats which were prepared and introduced in evidence by the plaintiff which show the entire property as belonging to the defendants and as being in one parcel, although part is referred to as highland and part as swamp. Further the record is replete with testimony to the effect that the defendants own the highland as well as the swamp land. Plaintiff's expert witness testified that the old service electric lines went on the highland property owned by the defendants. Plaintiff's surveyor testified that he crossed defendants highland in making the survey before he was instructed by one of the defendants to stay off the property. A substantial portion of defendants expert testimony was devoted to the valuation of the home place property, all of which was introduced without objection. At the conclusion of the trial, the trial judge was invited to inspect *470 the premises and in the presence of both counsel spent some time on the home place property. Although present throughout this visit, plaintiff's counsel did not suggest that there was any question as to the ownership of the highland property. During oral argument before this court plaintiff's counsel does not suggest that defendants do not in fact own the property as one parcel, but only that defendants did not prove their title to the property. Since the plaintiff's introduced plats in evidence showing the entire property as belonging to the defendants, and allowed, without objection, substantial amounts of testimony from many witnesses to the effect that the highland property and adjacent swamp land was owned by the defendants, we are of the opinion that plaintiff has admitted that defendants own the property in question, and that it is one tract.
In order that the reader may better visualize the property affected by this expropriation, we attach hereto Exhibits A and B which have been prepared at the Jefferson Davis Vocational School (for which grateful acknowledgment is hereby made) from information shown on two plats which were filed in evidence by the plaintiff. Exhibit A depicts the entire 145 acre tract showing where the right-of-way crosses the property. Exhibit B shows the proposed right-of-way, the presently existing 2,400 volt distribution line, and the home place property which defendants claim will be damaged due to this expropriation.
EXHIBITS A and B:

The record shows that all of the right-of-way here being expropriated is located on swamp land. During periods of unusual high tides on Lake Ponchartrain, the backwaters inundate all of the right-of-way property. Nine hundred and twenty-seven feet of this right-of-way, having a width tapering from 49 feet to 100 feet (1.41 acres) goes along Highway 22. The remaining thirteen hundred forty-four feet of the right-of-way has a width of 100 feet (3.09 acres), the centerline of which runs parallel to and is located 60 feet from the fence which separates defendants highland home place property from the swamp land. As to the 927 feet of right-of-way along *471 the Highway, we note that the new line is taking the place of a 2,400 volt distribution line which has been in place for many years.
Plaintiff called but one expert witness, Mr. Frank Patacek, who has been a licensed realtor in St. Tammany Parish for more than 10 years. Mr. Patacek has had broad experience in the appraisal of damages resulting from the expropriation of power and pipe line servitudes, and has made numerous appraisals on behalf of landowners as well as on behalf of the expropriating bodies. Mr. Patacek valued the swamp land which was fronting along the paved highway at $200.00 per acre and the remaining swamp land at $100.00 per acre. This valuation was for the fee title to the land including all timber. In this connection it is to be noted that defendants did not claim any damage for loss of the timber in place nor for loss of the future growth of timber. Mr. Patacek was of the opinion that the value of the servitude would be one-half the total value of the land, and that a fair price for the entire servitude would be $295.50.
In making this appraisal, Mr. Patacek was certain that there was no commercial or residential demand for the property here sought to be expropriated. Although he was unable to find any recent sales of comparable property, he found that in July of 1955, fifty acres of swamp land adjoining defendants' property on the south sold for $25.00 per acre. Mr. Patacek noted that certain highland located near the causeway approach was being offered for $1,000.00 per acre, but that there were no purchasers interested at that price. He also noted that certain highland located next to the corporate limits of Madisonville had sold for residential purposes for the price of $750.00 per acre. However, neither of these sales were considered by him to be remotely comparable for the reason that defendants' property was swamp land rather than highland and was situated in an area where there was no demand for either residential or commercial property.
It was Mr. Patacek's opinion that lines such as the one here involved are commonly seen along highways and in towns, and are not noticed. As to the clearing of the right-of-way, Mr. Patacek considered that this would result in an improvement to the property.
Defendants called three expert witnesses. Mr. Bryan D. Burns, Jr., testified that he had extensive experience in the real estate business managing family properties, but had only been in the real estate business for three years. He has recently been involved in litigation with this same plaintiff concerning a power line servitude across property in which he owned an interest, which litigation, according to his understanding, was still pending on appeal when this suit was tried.
Mr. Burns valued defendants' swamp land fronting on Highway 22 at $20.00 per front foot for a depth of one acre. However, three-fourths of this value is allotted by him to the value of the first 50 feet in depth, and therefore he valued the 927 feet of servitude fronting the highway at the sum of $13,905.00. This valuation was based on the belief that there was a usable strip of ground varying from 75 to 125 feet in depth next to the highway, and that this land was suitable for construction of commercial establishments such as restaurants, filling stations, etc. It is noted at this point that there is no evidence indicating that there is any residential or commercial development in the vicinity of defendants' property, nor do any of the witnesses know of any demand for similar property in this vicinity. The remaining 1344 feet of right-of-way was valued by Mr. Burns at $75.00 per acre, or $243.75. Thus Mr. Burns was of the opinion that the servitude alone was worth $14,148.75.
Mr. Burns estimated that the construction of the power line behind the home place property would depreciate the value of the defendants' property by 10 per cent. In calculating the total value of the property on which to apply the 10% figure to arrive *472 at the exact amount of depreciation, Mr. Burns testified that:
"I divided the property into approximately ten acres containing the home, the swimming pool and the outbuildings, and arrived at the following figures. Main house, large four bedroom, well finished home, $22,000; the pool and the bath house $11,000.00; garage, two car garage, $1,200.00; guest house $7,000.00, that's a three bedroom guest house; utility house $400.00; servant house, $1,600.00; tool house, $200.00 and I valued ten acres of land, which includes all other improvements such as shrubbery, 17 large oaks on it and two flowing wells, at $3,000.00 an acre, which brings that up to $30,000.00 and the total of the ten acres and all improvements is $73,400.00. Then I valued 927 feet running from the West boundary of the property to the first major angle to the picket fence, I put a value on that, one acre deep, but it could be several acres deep, I put a value on that of $20.00 a foot and it brought that up to $18,540.00. This value was placed on this property with the opinion that it's usable for commercial frontage. The value of the balance, 120 acres, behind the improved property and the commercial highway frontage at $75.00 an acre, which figures $9,000.00 even, bringing the total value of the property up to $100,940.00."
On this basis, Mr. Burns gave the opinion that the power line would depreciate defendants' property by $10,940.00 and that defendants should be awarded a total of $24,242.75 for the servitude together with the depreciation which would be suffered as a result of the erection of the line and maintenance of the right-of-way.
As comparables it is evident that Mr. Burns was using a small triangular shaped parcel of highland about two miles east of defendants' property at the intersection of Louisiana Highway 22 and the West Approach to the New Orleans Causeway, which was purchased some time before for a filling station site. He also referred to the recent proposal of the Covington Country Club to purchase a 50 acre tract of what he described as cutover land for $2,000.00 an acre. It developed that this tract was situated next to the Country Club's 9 hole golf course, and was then suitable for development as an additional 9 holes for the course. It was also brought out that this Country Club had only recently constructed a club house at a cost of about $115,000.00 and that there was a nearby residential development with new homes selling in the price range of $28,000.00 to $30,000.00 each. It was also brought out that Mr. Burns was listing some property referred to as the Burns property located at the same intersection of Louisiana Highway 22 and the approach to the New Orleans Causeway, on the corner opposite from the previously mentioned filling station site; that this property is highland; that this property was being offered at $1,000.00 per acre, but that there had been no purchasers as of the date of the trial.
As to the property in question, Mr. Burns conceded that there has been no new commercial development in the vicinity of defendants' property and that he knew of no demand or inquiries for the property in that locality.
Defendants second expert, Mr. Clarence J. Moore testified that he had not seen the property for approximately twelve years; that he was a former realtor from New Orleans, but is now and has been for the last eighteen months a salesman for a real estate firm in St. Tammany Parish; that he has been in the real estate business for twenty-five years altogether.
Mr. Moore valued the 927 foot servitude along the Highway at $15.00 per foot, and like Mr. Burns, valued the 1.41 acres there involved at $13,905.00. For the portion of the servitude along the rear of the home place property, Mr. Moore assessed a value of $1,687.50, although he did not offer any explanation as to how he arrived at that *473 amount. Thus the total for the servitude was set at $15,992.50.
In a fashion similar to that used by Mr. Burns, Mr. Moore valued the entire property including the home place at a total of $106,250.00 and expressed the opinion that the location of the power line would depreciate defendants' property to the extent of 10% of the present value, or $10,625.00, and that defendants should receive a total award of $26,617.50.
It is significant to note that Mr. Moore did not know the type of power line construction here involved. He admitted that in his experience the power line erected on Florida Street in Mandeville had no effect on the value of commercial properties located there. The record shows that the line to be installed is to be identical to the above mentioned Florida Street power line. Mr. Moore used as similar sales the sale of lots located on what he described as the western neck of the causeway and also from the sale of a 46 acre tract on the same road and at the same location. Without going into detail it is abundantly clear that these sales involved property not remotely similar in either condition or location to that of the defendant.
Defendants third expert appraiser, Mr. August Planche testified that he was not a realtor, but that:
"A. I have bought and sold land in St. Tammany Parish, very regularly for the past fifteen years and some six years prior to that.
"Q. Is that personally or for other people, or both?
"A. That's personally and for members of my family and for members of two companies of which I am vice-president of, two land companies."
Mr. Planche related that he has had numerous dealings with pipe line and power line companies as owner, both in and out of St. Tammany Parish. "In only two or three instances, we have had to go to court and that has been with Louisiana Power and Light Company and with Cleco." He testified that his family has "had a good bit of experience with power lines, and I regret to say that most of them have not been favorable experiences." Mr. Planche related that one of the expropriation cases filed by Cleco against his Company is presently on appeal.
Mr. Planche placed a value of $2,000.00 per acre to a depth of one acre for that part of defendants swamp land fronting the Highway. In calculating the value of the remaining swamp land, Mr. Planche concluded that he would make an overall average for the property expropriated at the sum of $1,250.00 per acre, and thus concluded that the servitude itself was worth $5,625.00 for the 4.5 acres.
Mr. Planche valued the home place property with improvements at $68,450.00, then added his values for the remainder of defendants' swamp land which he assessed at $27,537.75 and concluded that defendants' property was worth $95,987.75. He concluded that the erection of the line would depreciate defendants' property by 15%, thus arriving at a depreciation figure of $14,398.16. His total award then for the depreciation together with the value of the servitude itself would total $20,023.16.
In arriving at these values, Mr. Planche could point to no recent sales of property comparable to the defendants. He drew on his general experience and his observation that other properties not too far away are being sold for high prices. As examples, he pointed to the recent sales of lots in a residential subdivision on what is called "Bootleg Road", some five miles away, and the sale of a 4½ acre plot on the Techfuncta River, also in the same locality and fronting on the same Bootleg Road. So far as the record shows neither property is remotely similar in condition on location to the defendants' property.
Thus we see that plaintiff's expert appraised the servitude itself at $295.50, whereas defendants' experts appraised it at *474 $13,338.75, $15,992.50, and $5,625.00 respectively. The fact that defendants' counsel conceded in his brief to the trial court that the sum of $3,000.00 would be adequate compensation for the entire servitude (not including the damages to the home place property) is a fair indication that these appraisals are not based on recent sales of similar property. Notwithstanding the fact that counsel for defendant obviously disregarded the appraisals of his expert witnesses, it appears that the trial court accepted their conclusion that the highest and best use of defendants' property was for commercial purposes.
The law applicable to this case was completely summarized by this court in the case of Central Louisiana Electric Co. v. Harang, 131 So.2d 398, and we quote from that opinion starting at page 401 wherein we stated:
"It is the settled jurisprudence of this state that the valuation to be placed on expropriated land is its market value at the time of taking and that market value is the fair value as between a willing purchaser and a willing seller under ordinary and usual circumstances. Louisiana Highway Commission v. Israel, 205 La. 669, 17 So.2d 914; Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260.
"Market value of property expropriated for public use must be determined in the light of the best and highest use to which the property may reasonably be put but to constitute best and highest use for residential subdivision purposes in determining market value, it must be made to appear that there is reasonable expectation the property may be so used or developed in the not too distant future. Plaquemines Parish School Board v. Miller, 222 La. 584, 63 So.2d 6.
* * * * *
"In expropriation proceedings, the landowner, in addition to compensation for the property or servitude taken, is entitled to compensation for damage to contiguous land, not taken, caused by the use to which the property taken has been put. Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So. 2d 260; Louisiana Highway Commission v. Boudreaux, 19 La.App. 98, 139 So. 521. Damages to property not taken were formerly referred to as "consequential damages". Louisiana Highway Commission v. Treadaway, La.App., 173 So. 209, but more recently as "severance damages", Tennessee Gas Transmission Co. v. Primeaux, La. App., 100 So.2d 917; Texas Pipe Line Co. v. Barbe, supra.
* * * * *
"Where such consequential damages result from aesthetic considerations, the owner cannot be compensated therefor, Louisiana Highway Commission v. Boudreaux, supra, unless it is shown that there has been a diminution of the value of the property which remains after taking. City of New Orleans v. Giraud, 238 La. 278, 115 So.2d 349; East Baton Rouge Parish Council v. Koller, La.App., 94 So.2d 505.
"Among consequential damages for which a landowner may not be compensated are those resulting from the mental worry caused the landowner by the construction through his property of the facility for which the property or servitude was taken, Nagle v. Police Jury of Caddo Parish, 175 La. 704, 144 So. 425, and those damages which are anticipated, remote and speculative, Texas Pipe Line Co. v. Barbe, supra; City of Alexandria v. Jones, 236 La. 612, 108 So.2d 528.
"As held in Texas Pipe Line Co. v. Barbe, supra, the severance damages allowed are measured by the difference between the market value of the property for sale or rental purposes *475 immediately before and immediately after expropriation. See also American Tel. & Tel. Co. of Louisiana v. Maguire, supra [219 La. 740, 54 So. 2d 4].
"Severance damages may be based upon the percentage of depreciation to the remaining property caused by the dangerous condition presented by placing the utility on the property. Tennessee Gas Transmission Co. v. Primeaux, supra. Even where no real danger exists, compensation may be made for the mere fear of danger to the extent that such psychological effect of deterring prospective purchasers reduces its market value. Texas Pipe Line Co. v. National Gasoline Co. of Louisiana, Inc., 203 La. 787, 14 So. 2d 636; Texas Pipe Line Co. v. Barbe, supra.
* * * * *
"It has been repeatedly held by the appellate courts of this state that the best criteria of market value is recent sales of similar property in the vicinity of the property expropriated which transactions are commonly referred to as "comparables". State Through Department of Highways v. Hebert, 227 La. 111, 78 So.2d 528; Louisiana Power & Light Co. v. Simmons, 229 La. 165, 85 So.2d 251; Recreation and Park Commission of East Baton Rouge Parish v. Perkins, 231 La. 869, 93 So.2d 198.
"It is likewise well established that in the absence of comparables, the court must look to other evidence to determine fair market value. Rapides Parish School Board v. Nassif, 232 La. 318, 94 So.2d 40; City of Alexandria v. Jones, 236 La. 612, 108 So.2d 528."
In the light of these legal principles and the evidence adduced in this case, the opinions and estimates of defendants expert witnesses as to the value of the servitude here expropriated cannot be considered in arriving at a proper award, for the reason that there is no showing that the properties used as comparables are similar to the instant property either in condition or location. Neither was there any showing that there is any reasonable expectation that the property may be used or developed in the foreseeable future in the manner assumed by these experts when they appraised the property. The appraisals made by defendants' experts were on the basis that the property could be used for commercial and/or residential building sites. While admitting that they knew of no demand for this type property in this vicinity, they used as comparables properties located on the west causeway approach to the New Orleans Causeway and other more advantageously located properties. The fact that the property is swamp land subject to overflow obviously did not enter into these witnesses' appraisal. As noted by the learned trial judge, this property:
"* * * in its present state has very little market value for any purpose whatsoever, other than a beautiful picturesque sight to look at. The back end of this property has no conceivable commercial value. The 927 feet fronting the Highway would have to be filled in 3 or 3½ feet to get it above sea level, at a prohibitive cost. Property would have to be in much greater demand than at the present to justify this expenditure of money to make it suitable for use."
Equally false is the premise that the construction and location of the proposed power line will result in a complete loss of the entirety of the property encompassed in the servitude. Further, defendants' witnesses failed to take into account the fact that there presently exists along defendants' property which fronts the Highway, a power line somewhat similar to that which plaintiff now proposes to build. This old line along the highway will be replaced *476 with the same number of poles located at approximately the same places.
We believe that the unit price for the servitude of $100.00 per acre for the property fronting the highway, and $50.00 per acre for the property behind the highland property, as valued by plaintiff's witness, represents the true value thereof. Said amount will be awarded in compensation for the servitude to be acquired by plaintiff, resulting in an award to defendant in the sum of $295.50 for the 4.5 acre servitude taken.
In assessing "severance damages" the trial judge concluded that:
"From all the testimony in the record the Court believes that the 10 acres on which is located the home place, the two other houses, and the swimming pool is worth $50,000.00, and that the clearing of a 100 foot right-of-way so close to the edge of their lawn would mar the beauty of the home place and affect its sale value and damage it to the extent of 10% of its value or $5,000.00."
The plaintiff did not make its own valuation of the home place property. On the basis of the testimony, and the trial court having viewed the property and observed the witnesses during the taking of the testimony, we cannot find manifest error in the holding that defendants' home place property has a market value of $50,000.00.
Two of defendants' experts testified that the transmission line would cause a 10% depreciation in the value of defendants' property and the third expert testified that the depreciation would be 15%. Mr. Patacek concluded that the proposed line would have no adverse effect on the present market value of the defendants' home place property. It was his view that such electric pole lines along highways and property lines are quite common and that it had been his experience that such lines so located do not detract from the value of the abutting properties.
In our view, defendants sustained the burden placed on them to show that there will be a diminution of the value of the home place property as a result of the installation of the new 47 foot tall distribution and transmission power lines which will parallel the quarter mile long back line of this beautiful country estate at a distance of only 40 feet.
The record makes it obvious that at least some of these poles, guy wires and/or lines will be visible from almost any point on the home place estate. While there is a genuine belief on the part of some that such lines have no effect on the value of such property, even they must acknowledge that there are others who are critical about the appearance of such objects; that there are still others who would immediately point to the undesirable feature of having such a beautiful view ruined by this highline. It cannot be doubted that one interested in purchasing such a country estate would lower the offering price whether or not he be offended by the appearance of the highline because others would object to the appearance of this highline. To the extent that some people are offended by the appearance of such objects, the market value for defendants' home place has definitely been reduced.
The testimony that transmission and service lines do not affect the value of property on and along developed commercial and residential city lots does not necessarily mean that a line such as will be erected behind this country estate will not diminish the value of this property. Just as there are many who would not move to the country and suffer the routine disadvantages of living out of the city under any circumstances, there are others who place a premium on property located in the country where they will not have to be confronted with just such objects as this transmission line. It is common knowledge that many property owners, even in the city, will go to considerable expense to bury the electric service line to their *477 home in order to improve the appearance of their property.
While the establishment of the mere possibility of severance damages is not sufficient basis upon which to predicate an award therefor (Central Louisiana Electric Co. v. Stiegler, 131 So.2d 387) we conclude that the defendants have proved that the market value of defendants' home place property has been diminished.
In the Primeaux case, supra, severance damages were based upon the percentage of depreciation to the remaining property, and we accept that method as proper and applicable to this case. However, we are of the opinion that the trial court committed manifest error in concluding that the clearing of the right-of-way, the erection of the poles, highlines and guy wires by the plaintiff "affects its sale value and damages it to the extent of 10% of its value or $5,000." The percentages used by defendants' experts were not explained nor supported and in our view are manifestly excessive and should be reduced to 3% of the value of the home place estate or $1,500.00.
The defendants did not cite any evidence in the record which would tend to prove their allegation that defendants sustained $1,000.00 damages as a result of a trespass committed by the plaintiff's employees. Neither did they cite any law or jurisprudence authorizing such an award. We do not find that the defendants suffered any damages, and therefore the distinguished trial judge's refusal to grant such damages is affirmed.
Accordingly, the judgment of the trial court is amended by reducing the compensation awarded defendant for the servitude taken from $3,000.00 to $295.50 and by reducing the award of $5,000.00 severance damages to $1,500.00, for an aggregate award in the amount of $1,795.50, and as amended affirmed. Costs are to be paid by the appellant.
Amended and affirmed.