180 So.2d 784 (1965)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellant,
v.
John C. BURDEN, Jr., et al., Defendants-Appellees.
No. 6476.
Court of Appeal of Louisiana, First Circuit.
November 16, 1965.
Rehearing Denied December 21, 1965.
Philip K. Jones, Glenn S. Darsey, D. Ross Banister, Ben C. Norgress, Baton Rouge, for appellant.
Alvin B. Rubin and Robert A. Hawthorne, Jr., of Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, for appellees.
*785 Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
ELLIS, Judge.
This suit was instituted by the State of Louisiana, through the Department of Highways, September 24, 1963, for the expropriation of a parcel of land for a right of way for the St. Gabriel-Gardere Highway, in East Baton Rouge Parish, for highway purposes, in accordance with the authority conferred by Section 19.1 of Article VI of the Constitution of Louisiana and the provisions of R.S. Title 48:441-48:460.
Pursuant to the order of expropriation, the deposit of $7924.00 and the receipt of Clerk of Court on September 24, 1963 thus effected a taking of title to the full ownership of the property which was the subject of the suit containing 14.059 acres, being a part of an entire property containing 1015.65 acres.
The property owners in their answer had asserted a claim of $15,464.90 for the property expropriated and $200,794.00 for damages. After a trial on the merits, judgment was rendered on April 16, 1964, and judgment signed April 27, 1964, in the amount of $114,263.50 in excess of the original deposit of $7924.00, which represented an increase of $6,135.00 for the property taken and an additional award of $108,128.50 for damages to the remainder property. The amount of excess awarded, together with interest, was deposited in the registry of the Court on May 22, 1964, and withdrawn by the defendants on June 1, 1964.
The State of Louisiana, through the Department of Highways, has appealed from the judgment, while the property owners are asking that the judgment be affirmed.
The issues before this court are the market value of the property expropriated and the value of the severance damage, if any, to the remainder property.
Prior to and at the time of the taking, the 1015.65 acres of the defendant had been leased to one Callicott, who is not involved in any way in this suit, as pasturage for the latter's cattle. This tract of land was located approximately 10.6 miles from downtown Baton Rouge with a frontage on the eastern bank of the Mississippi River and was traversed by a right of way of the Illinois Central Railroad Company, a servitude of right of way of Humble Pipe Line Company, which carried ethylene, and a servitude of right of way for a high power electric line, all of which rights of way adjoined and crossed the property of defendants from north to south. The right of way expropriated herein for the highway is parallel to the rights of way mentioned, and adjoins the pipeline servitude and traverses the property of defendants from north to south and is located on the extreme westerly portion of the tract situated east of the railroad and pipeline rights of way. The property of the defendants lying to the east of the railroad and pipeline rights of way and the land herein expropriated contains 740 acres while that portion of defendants' property, situated on the tract located west of the railroad and power line rights of way and fronting on the Mississippi River, contains 275 acres.
In order to arrive at the value of the property, it is necessary to pass on the question of the highest and best use of this property as of the date of the taking, which was done by the District Judge. The plaintiff in the syllabus of his brief has generally stated the correct law with regard to this question and we quote therefrom as follows:
"Fundamental to the concept of value is the theory of highest and best use and market value must be determined according to the highest and best use thereof, provided that a market or demand therefor be shown with reasonable certainty in not too distant future. State of Louisiana, Through the Department of Highways, v. Hedwig, Inc., (1961), 133 So.2d 180;

*786 Central Louisiana Electric Co., Inc., v. Louise Badeaux Mire et al. (1962), 140 So.2d 467;
State of Louisiana, Through the Department of Highways, v. Carlton C. Kemp et al. (1962), 141 So.2d 487;
State of Louisiana, Through the Department of Highways, v. Luke Carlina (1964), 169 So.2d 265;
Pearl River Water Supply District v. Hazel A. Wood (1965), 172 So.2d 196 (Advance Sheet No. 1, dated March 25, 1965);"
On the other hand, counsel for defendants in the beginning of a discussion of "The highest and best use" rule in his brief has cited State, Through Dept. of Highways v. Madden, La.App.2d Cir. 1962, 139 So.2d 21, at page 23, wherein the Court stated:
"It is equally well settled that in suits of this kind the most profitable use to which the land can be put by reason of its location, topography, and adaptability, will be considered as bearing upon its market value."
and again State, Through Dept of Highways v. Hedwig, Inc., La.App. 4th Cir. 1961, 133 So.2d 180:
"Fundamental to the concept of value is the theory of highest and best use, i. e., that use which, at the time of the taking, is most likely to produce the greatest net return."
In deciding the question of the highest and best use of the property at and prior to the date of the taking, the lower court considered the testimony of the two experts who testified on behalf of the State that the highest and best use of this property was for grazing and that the land had some potential industrial prospects and these appraisers fixed the value of the land at $550.00 per acre, which counsel for the State in argument readily admitted was rather high for pasture lands.
The two experts who appraised the property and testified on behalf of the defendants and upon which the lower court based its opinion that "it has been shown by a clear preponderance in this case that the highest and best use of this property is for industry" gave lengthy and detailed explanations as the bases of their opinions as to why the highest and best use of this property was for industry. There is no doubt from the record that the experts for the defendants were highly qualified as they had dealt in industrial properties for their own accounts and for the accounts of others, whereas the State's experts had not dealt with this kind of property. Counsel for the defendants has correctly and concisely set forth in his brief the comparables which were considered by these appraisers in reaching their conclusion that the highest and best use of the property was for large industrial purposes as well as the testimony of these experts as to the characteristics of the subject property that made it comparable to the property used as comparables, and a resume of their testimony upon which they based their opinions that the subject property's highest and best use was for large industry in the foreseeable or "not too distant future".
We take the liberty of quoting from counsel for defendants' brief as follows:
"Mr. Brown and Mr. Munson both concluded without reservation that before the taking the Burden property possessed the same physical characteristics sought by industry as other tracts involved in sales to industry along the River and that the highest and best use of the subject property before the taking was for large industrial purposes (Tr. pp. 103, 160.). In reaching this conclusion, they both considered the following comparables:
(1) Felix A. Planche to Gulf States Utilities Company. This sale occurred in 1957 and involved a 400 acre tract which sold for a price of $1500 per acre (Tr. pp. 22, 101). The property had River frontage, rail service, and ethylene pipeline access and was located *787 within a few miles of the subject property (Tr. pp. 103, 164).
(2) Dr. Jack R. Jones and Bob R. Jones to Borden Company. This was a sale of 868 acres in March of 1961 for industrial purposes. The price was $1300 per acre. This tract had good River frontage and was crossed by the same railroad and products pipeline crossing the subject property (Tr. pp. 101-102, 165).
(3) Riverside Plantations to Allied Chemicals. A 1500 acre tract with River frontage not very far from the subject property on the same railroad and pipeline was sold for $1000 per acre (Tr. pp. 98, 165, 177).
(4) Henry G. McKowen to Union Oil Company. A 1000 acre tract with River frontage on the same railroad and pipeline as the subject property was sold in July of 1962 for $1100 to $1107 per acre for industrial purposes (Tr. pp. 100, 164).
In addition, Mr. Brown considered the following transactions in appraising the highest and best use and fair market value of the subject property:
(1) Riverside Plantations to Goliad Corporation. This was the first sale from the Riverside Plantations property (Tr. p. 106). A small 69.69 acre tract was sold for industrial purposes for $1500 per acre. It had rail and products pipeline service (Tr. p. 99).
(2) Riverside Plantations to Union Oil Company of California. A 489.92 acre tract fronting on the Mississippi River crossed by the same railroad and pipeline which traverses the subject property was sold in October of 1961 for $1200 per acre (Tr. pp. 98-99). Forty per cent of this property was wooded. (Tr. p. 104).
* * * * * *
"The characteristics of the subject property that make it comparable to the property listed above were summarized by Mr. Brown as follows:
"`Well, I think typically and basically you would characterize the subject property and the other properties that I considered as having front on the east side of the Mississippi River on the channel side of the river, which of course goes from side to side, but in each case the property involved has been at the channel side, being served by rail and being large enough to be attractive to industry. There was some further element of comparability in several of these. Although all of the people who bought are not using it, an important attribute is the existence here of Interstate Pipe Line Company's products line which carries, among other things, principally Ethylene to the salt dome storage at Sorrento and Ethylene is probably the most important intermediate, sometimes called building block chemical, that is produced in this area.' (Tr. pp. 97-98; emphasis added.)
"Mr. Munson listed these and other features in the following language:
"`You are required to have at least a thousand feet of river frontage and you should have 1500 feet of river frontage for property to be used comfortably. If you don't have that frontage, if you don't have that much frontage it will give you trouble in bringing in barges and ships. They look for cleared land, good elevation, drainage, and I would like to add at this time, the subject property has Manchac Bayou for drainage and this is an excellent thing to have because they are digging it out presently. You must have railroad and it should be accessible to population areas. It should have enough width for a plant to locate on and the roads and railroad locations are something to be considered.' (Tr. p. 171; emphasis added.)
*788 "The conclusions of these gentlemen, both highly qualified and experienced in the field of appraisal, ownership and brokerage of River industries properties (Tr. pp. 90, 91, 162) are in accordance with the rules set forth in the jurisprudence. The opinions of Messrs. Brown and Munson were based upon reasonable expectations for the foreseeable future.
"Mr. Brown explained as follows:
"`There has been a proven demand, and these sales that I've used as comparables prove it to my satisfaction, for tracts of land of 600 to 1500 acres on the east bank of the Mississippi River, on the channel side of the river, that are drained, are served by the Illinois Central Railroad and have usable water front, and these other sales which are nearby as to area, that are considered all a part of the same area, indicate that to me. All the sales of that type of property have been to industrial users. In my opinion that establishes the market and a pattern. I think if those were 50 by 120 foot lots and they were that far apart in distance and time, then I would think there was something else, but we are dealing with a commodity here for which there has been a pattern established, and that's my reason for saying that there is a use and demand for the property for this purpose.' (Tr. pp. 143-144; emphasis added.)
"`The pattern in this market is not a sale every month or every six months. There is a definite pattern and it's a definite pattern and it's a sale sometimes once a year, sometimes two sales a year, sometimes you go two or three years without a sale, but every one of these properties that's changed hands since the first industry came down on the river between Baton Rouge and the Bonnet Carre Spillway after Wyandotte, except a couple of speculators, has been to an industry that has followed this pattern. Now if this was a property on Florida Boulevard extension here in Baton Rouge we would expect to see the sales closer together and although we may have a very desirable piece of property across the street from Sears and as there is for sale, I think the fact that there's nobody waiting this month to buy it or today to buy it, or next month, doesn't mean that there's no market for this. It's a relative matter. Within six months or a year, or maybe next year, someone will call to buy it, and when the next property is sold in that area that's dominated by Sears, it's going to be at a price that's established by those other recent sales. So I think we are in a different type of market here than we are in a quick moving, hot retail area.' (Tr. pp. 145-146; emphasis added.)
"`(M)y experience in these sales is that one day there's not a demand and then you get a phone call from somebody whose, someone who prefers to be anonymous, and then you have a team of engineers going over property and then later you have a sale. There was no demand for the Allied property site until the people from Union-Texas came to town.' (Tr. p. 145)
* * * * * *
"Mr. Munson analyzed the demand for the subject property for industrial purposes as follows:
"`The highest and best use of a property doesn't necessarily mean that it, that it's the use to which the property is presently being put. I have 500 acres which I'm using as cattle land and I sold 300 acres of that for $1,000,000 as an industrial use. The property which I have appraised has a good river bank which is being sought by many firms desiring deep water frontage along the Mississippi River below Baton Rouge. This land is becoming more and more scarce and the property owner is becoming more and more reluctant to *789 sell * * *.' (Tr. p. 162; emphasis added.)
"`There is a general demand for river frontage. The river frontage is becoming more scare with deep water and available properties. A thousand dollars in my opinion is the minimum value of good river frontage anywhere between here and Geismar as of today. They are more than that in many cases. I have appraised properties for $1500 per acre in other areas just below this.' (Tr. p. 179; emphasis added.)
"Speaking further about the subject tract, Mr. Munson said:
"`That is a good industrial site and will be sold if it's offered on the market * * *.
"`There has not been too many developments in the area and I can give what is my opinion of why there has not been any development in the area. The Gianellonis want to sell their 5000 acres all at once and that has held up the development of the general area to some extent, but the property is ripe and ready to be sold and will be sold if it's offered on the market within a reasonable length of time and it will be a reasonable purchase at $1000 per acre.' (Tr. p. 180; emphasis added.)"
Counsel on behalf of plaintiff in his brief comments upon the fact that the two experts, Mr. Brown and Mr. Munson, had also used as a comparable the Louisiana Machinery Company sale to Skelly Oil Company and the expert Munson "seemed to be attempting to show that the sale was not a comparable transaction of property because it had been used by witnesses for plaintiff and despite the fact that this property enjoyed river frontage of 1385 feet (tr. 239) as compared with a requirement by industry of a river frontage of 1000 feet."
Regardless of whether this property was comparable or not, we are of the opinion that the other sales used as a basis for their opinion by the defendants' expert appraisers were comparable and preponderantly prove that the highest and best use of the subject property was for large industry in the foreseeable and not too distant future. We are of the opinion that the value as fixed by the trial judge at $1000.00 per acre is fully sustained by a preponderance of the testimony.
The only question remaining for decision concerns the claim for severance damages for which the District Court awarded the sum of $108,128.50. In his brief counsel for plaintiff states that in the instant case "the primary issue is the exorbitant amount awarded by the trial court for damages", and the contention that "the defendants are not entitled to any severance damages" and his reasons therefor which we quote in part:
"The estimate of severance damages, as determined by the witnesses for the defendants, is entirely unsupported but is predicated on a contingency to occur in the future and such damages are wholly anticipated and speculative. No facts support the conclusion that the subject property has sustained damage because it can not be used for industrial purposes subsequent to the taking except at some unknown and remote time in the future. The position of the defendants and their witnesses is contrary to the jurisprudence of Louisiana with reference to the issue of severance damage. The damage envisioned is wholly illusory, problematical and too speculative to form the basis for the enormous amount of severance damages estimated by the witnesses for the defendants. Not one inquiry for the use of this property as industrial land was mentioned. In the case of City of Alexandria v. R. J. Jones et al. (1959), 236 La. 612, 108 So.2d 528, the law that damage *790 must not be anticipated was clearly stated by the Supreme Court:
"`The general law involved in this case is simply that the owner is entitled to the market value at the time of the expropriation and market value is what a willing purchaser will pay a willing seller under ordinary circumstances. He is also entitled to resulting or severance damage to the remaining property when only part is taken and damage results thereby to the remainder. In the latter case the measure of compensation is the diminution in the value of the remaining properties for sale or rental, determined by arriving at value immediately before and after the expropriation. The consequential damage must not be anticipated damage, or too remote and speculative. And mere consequential injuries to the owner arriving from discomfort, disturbance, injury to business and the like are not recoverable. The damages claimed must be shown to be reasonable certainty.' (Emphasis Added)"
Counsel for the State in brief additionally cited the case of Texas Pipe Line Company v. Barbe (1956), 229 La. 191, 85 So.2d 260, and quoted several excerpts therefrom which counsel stated "show conclusively that the Supreme Court considered that the pipeline servitude under scrutiny actually separated and divided the whole tracts into additional tracts and, though considered as causing severance damage, such a separation or division of the whole property existed in the instant case prior to the taking of the right of way for the projected highway."
We are of the opinion that the learned District Judge below has in his written reasons for judgment generally answered the above contention and we therefore will quote such portions:
"Of course the question of severance damages is the most difficult question here. Before we get into that precise question I feel justified in making some general observations relative to the advantages or disadvantages of a paved highway running through property of this character. I suppose it is natural for people at first blush to say that the location of a paved highway always appreciates the value of the property in that area. At the risk of being classed as old fashioned or antique, I want to make this observation. Conceding that access to a paved highway is desirable, I do not concede that having a paved highway run across your property or even running across the front of your property is always to be desired. I will go further and say that while paved highways are recognized in these modern times as a necessity there are times when they become an abomination either in a greater or lesser degree.
"Now the testimony of both Mr. Brown and Mr. Munson, and more particularly that of Mr. Brown in which Mr. Munson concurred, is to the effect that for a big industry such as we've been speaking of, a paved highway running through its property is an abomination. To me that is understandable. Mr. Brown emphasized the fact that such an industry wants to be able to let into its property those that it desires to have enter and to keep out those that it desires to keep out. He illustrates that by giving two examples coming to his own personal knowledge. One was in connection with the proposed sale of what I believe he called the Orange Grove tract. It had the word `orange' in it I am certain. He testified that before the purchaser would consider buying that property he required that the highway be relocated and put elsewhere than on the property. He gave another example of the owners of one of these large industrial tracts becoming much disturbed when they found highway engineers staking lines across the property, and on investigation *791 found that there was a possibility of a location of a paved highway at that point. Work was stopped until they could meet with the officials of the department, and that meeting resulted in a relocation of the highway. I had thought during the trial of this case that it might have been wise for the department to have remembered that incident and to have considered another location of the highway, but it appears certain that any other location of the highway, avoiding the problem that we are faced with here would have increased the length of the highway to such an extent that the department probably concluded it would stick to the shortest route and take its chances on whether it had to pay any severance damages for so doing, and as a matter of fact it might save money even though it is held liable for severance damages in this case.
"Since I am convinced that severance damages have been suffered, the next question is determining the amount of those damages.
* * * * * *
"I have no way of determining severance damages except to follow the testimony of an expert.
* * * * * *
"That is not of any particular importance, gentlemen, except to say here that there is a relatively slight difference in severance damages found by Mr. Brown and Mr. Munson, and I emphasize the word `relatively', it is roughly $7,000. Mr. Munson found severance damages of $115,147, Mr. Brown found severance damages of $108,128.50. Without criticizing Mr. Munson's approach, I am going to follow Mr. Brown's findings there. The difference comes as you know in that of the 285 and a fraction acres west of the railroad. Mr. Brown put a present value of $1750 per acre and Mr. Munson put a present value of $1600 an acre, and on the upward of 700 acres remaining east of the railroad, or east of the taking, Mr. Brown placed an acreage value of $550 and Mr. Munson an acreage value of $600, and when you consider the two together the difference is right at $7,000. I have not calculated it down to the odd dollars. They of course reached the same conclusion as to the value of the acreage taken."
We will further consider the question of severance damages as presented in the arguments of plaintiff in the light of the quoted portion of its brief. We do not believe that severance damages are wholly speculative where the facts conclusively prove that the best and highest use of the subject property is for large industry and that the property has all the necessary characteristics and physical factors to attract such industry and is one of a relatively few acreages still available and obtainable for such a purpose. It has been conclusively shown that the subject property falls into this category. While it is true that there is no testimony that there had been any inquiry for the use of this property as industrial land, such proof is not necessary where the facts show that the land has every attribute and physical quality necessary and attractive for industrial use and, in addition, there are a large number of industrial plants located on similar land within a reasonable distance and the subject property is one of a relatively few available.
It is also plaintiff's contention that this property was divided prior to the taking by the servitude of the railroad, pipeline, and power line. The testimony convinces us otherwise for it has been established that the railroad, the ethylene gas line, and the power line traversing the property have not been considered by purchasers of land which is in industrial use as a division of the property but as an asset, whereas, a highway across the land has been considered as dividing the land and as a detriment *792 where it traverses the property as in the present case. Plaintiff's argument is also fully answered in the recent case of State Through Dept. of Highways v. Williams, La.App. 3d Cir., 131 So.2d 600, which was an expropriation suit involving a tract of land traversed by a railroad and pipeline right of way. The property in the Williams case was in an area which had evidenced great industrial expansion, as in the case at bar, and the experts had testified that the land was eminently suitable for industrial use by reason of its characteristics, including ready rail and highway access and the easy availability for industrial use of natural gas and crude oil through the pipeline facilities on the land, as is true in the case at bar. Also, the possibility of the land's use for industrial purposes was not remote and speculative, as contended by the plaintiff's counsel, but, within the reasonable probabilities of the situation, was an effective and real factor in the land's market value, as has been shown in the present case.
In the Williams case it was also urged by the plaintiff that the tract was already divided into two parts by the railroad right of way across the northwestern portion and that the pipeline rights of way on both sides of the railroad right of way already separated the land from the railway tracks. With regard to this contention the Court held:
"We regard this summary as correctly stating the principles to be applied in Louisiana in deciding the question, and no controlling contrary authority is cited to us. The trial court correctly applied these principles in determining that, as a matter of fact, the defendants' property consisted before the taking of a single 120-acre tract suitable for industrial purposes. For, as the evidence indicates, the owner had the legal right to cross the railroad and pipeline servitudes and the legal right to use the pipeline rights of way for many purposes, all of which under the circumstances reflected by this record constituted these rail and pipeline rights of way an asset in the integrated industrial use of the entire tract (even though there was a lessened fee value of the strips themselves actually subject to the rail and pipeline servitudes)."
The court further held in the Williams case that:
"An award in expropriation proceedings should take into consideration `all factors which lead to a replacement of the loss caused by the taking' and should place the owner `in as good a position pecuniarily as he would have been had his property not been taken.' State through Dept. of Highways v. Ragusa, 234 La. 51, 99 So.2d 20, 21. `As long as the acquisition adversely affects the market value of the remaining property, any type of injury would seem to be recoverable as severance damages.' Comment, `ExpropriationConsequential Damages Under the Constitution,' 19 La.L.Rev. 491, 495-496 (1959)."
We have the same facts in the case at bar as were the basis by the court in the Williams case for its holding that prior to the location of the highway the land was a single tract whereas after the expropriation and location of the highway across the land it was considered as having been divided into two tracts and on that basis severance damages were recoverable. Also see State Through Dept. of Highways v. Cities Service Refining Corporation, La. App., 3d Cir. 1961, 135 So.2d 636.
We, like the learned trial judge, know of no way to fix these severance damages except by the testimony of the expert appraisers who testified on that subject. The plaintiff's witnesses testified there was no severance damage and therefore we are left only with the testimony of the defendants' witnesses as to the severance *793 damages. Briefly, the latter experts, Brown and Munson, both concluded that the fair market value of the Burden tract immediately before the taking was $1,015,650.00 as a river industrial site but that the taking effectively precluded sale of the 716.1 acres remaining east of the taking along with the 285.49 acres fronting on the river as a single industrial site. Brown was of the opinion that 716.1 acres still have an industrial potential and he appraised its fair market value at $550.00 per acre after the taking, which gave this acreage the benefit of being served by the new highway which was the subject of the taking, whereas Munson considered the portion remaining east of the taking to have a fair market value of $600.00 per acre after the taking and was of the opinion that after the taking this portion of the tract should be considered as possibly residential land and no longer in competition as a river industrial site because of the taking. Both, of course, were of the opinion that the taking did not affect the highest and best use of the land remaining west of the taking or between it and the river and was still a usable industrial site. Brown was of the opinion that the 285.49 acres remaining west of the taking would sell for $1750.00 an acre after the taking or a total of $499,607.50 while Munson appraised it at $1600.00 per acre or a total of $456,784.00 after the taking. Based on these figures Brown computed the difference between the fair market value of the remaining land immediately before and immediately after the taking to be $108,128.50 whereas Munson computed severance damage to the remaining property at $115,147.00. This is the only testimony with regard to the amount of severance damages, which are supported by reasons therefor in this record.
For the above and foregoing reasons, we are of the opinion that the judgment of the lower court is correct and accordingly it is hereby affirmed.
Affirmed.