301 So.2d 384 (1974)
STATE of Louisiana Through the DEPARTMENT OF HIGHWAYS
v.
Harry STEIN et ux.
No. 6383.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1974.
*385 D. Ross Banister, William W. Irwin, Jr., Jerry F. Davis and Johnie E. Branch, Jr., Baton Rouge, for plaintiff-appellant.
Martin, Himel & Peytavin, John L. Peytavin, Lutcher, for defendants-appellees.
Before STOULIG, BOUTALL and SCHOTT, JJ.
SCHOTT, Judge.
This is a highway expropriation case involving 16.708 acres taken from a tract of land on the east bank of the Mississippi River in St. James Parish. The trial judge awarded $20,885 for the property taken and $48,574.82 for severance damages to the remainder of defendants' property. Plaintiff has appealed from that portion of the judgment awarding severance damages while defendants have neither appealed nor answered the appeal. Plaintiff's contentions are that there was no severance damage, and in the alternative that any severance damage was offset by special benefits to the remainder of defendants' property as a result of the construction of the project.
Defendants' land measures about 3,000 feet along the Mississippi River and runs back to the 80 arpent line between narrowing side lines. It is bisected from east to west by the Sunshine Bridge to Donaldsonville and by the right-of-way of Highway 3089 running from the bridge toward the Airline Highway in Sorrento. The property is bisected on the western end by Louisiana Highway 44, the River Road, running north-south through the property. This appeal is concerned with the effect the construction of the subject project had on some 604 acres of property fronting on the River Road on the west and extending away from the river straddling the approaches of the Sunshine Bridge and the bridge itself with its corresponding servitude over defendants' property.
Prior to the subject taking, the Sunshine Bridge approaches consisted of Highway 3089 running from east to west leading directly into the ramp of the bridge and two cloverleaf type curving roadways on each side of the approach to the bridge, connecting the bridge to the River Road. This configuration is shown on Figure 1. At *386 that time there was no direct connection between Highway 3089 and River Road which necessitated the subject project. As shown on Figure 2, this project consisted of the construction of parallel roadways south of the existing bridge and ramps running from River Road on the west to Highway 3089 just east of the bridge.

The roadway accommodating west bound traffic on Highway 3089 curved off the highway to the north, turned under the Sunshine Bridge in a southerly direction, and then turned in a westerly direction at that point where it paralleled the other roadway which came from River Road and then bent to the north linking with Highway 3089 accommodating traffic moving in an easterly direction.
As the result of this taking defendants' property was cut into five distinct parcels: Parcel 1, a cone shaped piece consisting of 3.122 acres was bounded on the south by the new twin roadways, on the north the original bridge ramp, on the east by the *387 convergence of these three roadways, and on the west by the River Road; Parcel 2, consisting of 54.7 acres was bounded on the north by the new twin roadways, on the south by the original property line of defendants, on the west by the River Road and on the east by a 300 foot segment of the railroad line which traverses the entire property from north to south; Parcel 3, consisting of 276.1 acres was bounded on the west by that same segment of railroad, on the north by newly constructed roadways, and by existing Highway 3089, and on the east and south by defendants' original property lines; Parcel 4, consisting of 7.397 acres, was bounded on the south and east by the newly constructed roadways, on the west by the railroad and on the north by the servitude belonging to the Sunshine Bridge, and having physical access under the bridge to remaining Parcel 5, consisting of 246.2 acres on the north side of the Sunshine Bridge, segments of the newly constructed ramp north of the bridge and Highway 3089.
The trial judge found that severance damage did result from the project to defendants' property on the south side of the bridge and Highway 3089, i. e., Parcels 1, 2, 3, and 4, but that no damage resulted to Parcel 5.
Chester A. Driggers, one of plaintiff's two experts, testified that there was no severance damage to defendants' property on the south side of the bridge but on the contrary this property was increased in value by $77,710 as a result of special benefits from the project. He detailed these benefits as consisting of an increase of $5,000 per acre to Parcel 1, $1,000 per acre to Parcel 2 and $1,000 per acre increase to Parcel 4. As to No. 1, he opined that this became an ideal commercial corner as a result of increased highway frontage resulting from the new road on the south side of this parcel. Similarly, the new highway frontage on the north side of Parcel 2 provided an increase in its value. Parcel 4 became an attractive small industrial tract because of the railroad frontage on it, and from 29.2 feet of accessible highway frontage on the new roadway on its south.
The other expert called by the plaintiff, Julius A. Bahlinger, concurred for the most part with Driggers.
On the other hand, defendants' experts, Kermit Williams and John Lejeune, were of the opinion that the property had suffered severance damage. They insisted that before the taking property on the south side of the bridge was an integrated tract, ideal for industrial use, with 1,300 feet of river frontage, highway frontage along the River Road, 1,200 feet of railroad frontage and accessibility to pipelines and powerlines in the vicinity. As a result of the taking, railroad frontage for Parcels 2 and 3 was reduced to 300 feet, too short a distance to accommodate railroad sidings on the property. Williams rejected the theory that the property as a whole was benefited by the conversion of the small Parcel 1 to a commercial site as was suggested by Driggers. Williams opined that industrial users are not attracted by the presence of or close proximity to small commercial developments, maintaining that the highest and best use of these remainders was industrial rather than commercial. Williams found that the distorted irregular shape of Parcel 1 would offset any advantage it might have gotten by increased access to highway frontage, that the damage done to Parcels 2 and 3 by curtailment of railroad frontage caused these tracts was considerable and that the isolation of Parcel 4, except for a theoretical 29.2 foot length of highway frontage, caused considerable damage to it. Williams concluded that Parcel 1 suffered a loss of 66% with a resulting value of $450 per acre, that Parcels 2 and 3 suffered a 10% loss with a resulting value of $1,125 per acre, and that Parcel 4 suffered a 50% loss or had a resulting value of $675 per acre. Lejeune agreed substantially with the opinions advanced by Williams.
*388 In resolving the conflicts between these pairs of experts, the trial court in reasons for judgment said the following:
"All the experts were in agreement that the property under consideration was valuable and desirable from any point of view. Mr. Driggers and Mr. Bahlinger reached the conclusion that before the taking the highest and best use of the property was industrial, and that while the construction of the interchange severed the original tracts into portions, the land as a whole was benefited because it was now suitable for development into residential, commercial, industrial and agricultural areas which when added together increased the value of the property to such an extent that the property benefited and suffered no severance damage.
"Mr. Williams and Mr. Lejeune reached their conclusions by considering that before the construction of the Sunshine Bridge and Louisiana Route 3089 the highest and best use of property was industrial. It remained such following this construction although the tract could now be considered as two tracts divided by a servitude. After the taking for the Interchange, they were of the opinion that the two portions remained industrial although not as desirable as before the taking.
"Considering these facts the Court reaches the conclusion that the highest and best use of the property after the taking is still industrial and that the property has suffered severance damage because of the taking.
"The appraisers for the State to sustain their contention of special benefit, rely principally on a finding of increased roadway frontage to the severed parcels along the interchange. The Court, however, finds that the taking is in fee with a mineral reservation and that abutting owners would have access thereto only by permission of the Department of Highway. Not a single witness was produced by the plaintiff to testify that any access had been or would be granted along the Interchange. The conclusion of the appraisers in this regard can not be accepted particularly in view of the allegations of the petition that the Interchange would have controlled access.
"All the experts agree that the deep river frontage and accessibility to the railroad made this property most desirable as an industrial site before the taking. By dividing the tract into areas of commercial, residential, agricultural and industrial, the remainders would be substantially different from a suitable industrial site. This is quite apparent from a consideration of the remainder designated as Tract `C'[1] on Exhibit D-5. To accept the proposal of Mr. Driggers and Mr. Bahlinger it will be noted that the 1300 feet of deep river docking facilities, a feature most desired by industry, would be lost. The interchange leaves a remainder on Tract `C' of only 300 feet accessibility to the eastern and western portions with only 300 feet of railroad frontage. Thus, Tract `C' is narrowed at this point and left without the capacity to support a spur into either portion.
"The Court is of the opinion that the property has retained its character as desirable industrial property, with an advantage of being included in the near and foreseeable future in a petro-chemical complex. Commercial, residential and agricultural areas have no place in such a complex.
"We have accepted the valuation by three of the experts of $1250.00 per acre as the fair market value of the property remaining to respondents. We have accepted Mr. Williams appraisal of the percentage of loss suffered by each portion of the remainder as fair and reasonable to be applied however, to a value of *389 $1250.00 per acre as the highest and best use after the taking. Accordingly, we recompute the loss suffered by the remainder as follows:

 "(604.277 acres at $1250.00 per
 acre) $755,283.75
 Total land affected by the taking
 Less: Value of part taken
(16.708 acres at $1250.00 per acre) 20,885.00
 ___________
 Total value of remaining as part of
 the whole. $734,398.75
 Value of remainder after taking
Remainder `A' (3.122 acres at $416.66 $1300.81
 (66% loss)
Remainder `B' (7.397 acres at $625.00 4623.12
 (50% loss)
Remainder `D' (246.2 acres at $1250.00 307,750.00
 (no loss)
Remainder X' (330.8 acres at $1125.00 372,150.00
 __________
 (10% loss)
Total after taking $685,823.93
Estimate of Damage 48,574.82"

The principal contention advanced by plaintiff is that the judgment of the trial court is at odds with the following expression in State Department of Highways v. Christy, 283 So.2d 533 (La.App.1st Cir. 1973):
"Where the opinion of the expert as to severance damage is based on the percentage method of diminution in value and is not based upon any actual evidence of market value and could not be justified upon any sound reason which would effect a decrease in market value, such testimony must be considered only as an individual and unsupported expression of opinion. Louisiana Power & Light Company v. Pipes, 188 So.2d 639 (La.App.2nd Cir. 1966)."
The distinction between the instant case and the two cited cases is that in the latter there was neither actual evidence of market value nor sound reasons effecting a decrease in market value to justify a diminution in value, but in the instant case defendants' appraisers did advance such sound reasoning. The two plaintiff's experts arbitrarily dismissed the notion of severance damage in the instant case, whereas the defendants' appraisers made a reasonable presentation as to why the property on the south side of the Sunshine Bridge was seriously damaged because it was changed from an integrated tract of land containing all of the features which would appeal to an industrial user to a number of disjointed parcels, some of irregular distorted shape, and particularly with the result that the railroad frontage of the original integrated tract was virtually destroyed because such railroad frontage was limited to the extent that it could hardly be used to advantage on the property any longer after the taking. In effect, the posture of this case is the same as that found in State Department of Highways v. Burden, 180 So.2d 784 (La.App.1st Cir. 1965) and cited and quoted with approval by this Court, in State Department of Highways v. Neyrey, 186 So.2d 705 (La.App.4th Cir. 1966), as follows:
"We like the learned trial judge, know of no way to fix these severance damages except by the testimony of the expert appraisers who testified on that subject. The plaintiff's witnesses testify there was no severance damage and therefore we are left only with the testimony of the defendants' witnesses as to the severance damages."
Plaintiff criticizes defendants' appraisers because of their failure to utilize comparable sales occurring after the taking as their basis for the property's diminution in value. Plaintiff characterizes their estimates as "guesstimation." Verily such comparable sales would be the most convincing foundation for these expert opinions, but they are not essential where sound reasoning is demonstrated by the experts in formulating their opinion. It is significant that the same criticism could be leveled against plaintiff's appraisers in their testimony concerning severance damage and special benefits. They used no comparable sales but relied on reasoning to support their opinions. We have concluded as did the trial judge that the opinions of defendants' pair of experts were more reasonable than those of plaintiff's.
While plaintiff stoutly maintains that defendants suffered no severance *390 damage, the principal thrust of its case is that any severance damage was offset by special benefits accruing to the property as a result of the project. In analyzing plaintiff's proof of special benefits we are guided by the principle that the burden of proof is on the expropriating authority to prove such special benefits. State, Department of Highways, v. Crow, La., 286 So.2d 353 (Sup.Ct.1973).
Plaintiff's case for special benefits rests on the theory that defendants' property was enhanced by the addition of a considerable amount of new highway frontage. Although in its original petition plaintiff alleged that the "project provides for the construction of a controlled access facility" the surveys attached contain the legend "Begin C of A" at a point near the east side of the railroad between Parcels 3 and 4. It was established that access to the new road would be available between River Road and a point 29 feet east of the railroad, such access to be administered pursuant to LSA-R.S. 48:344 which provides:
"Entrances to and exits from private properties adjacent to the rights of way of state highways may be regulated, prohibited, or abolished in the interest of the safety of the traveling public..."
The trial judge held that plaintiff's failure to call a witness to testify that defendants would be granted access to the road was fatal to plaintiff's case on accessible highway frontage and it is this finding which plaintiff strenuously contends is an error of law.
The question is not susceptible to easy disposition. The cited statute does place the regulation of access in the hands of the Department of Highways and it does stand in contrast to R.S. 48:302, which authorizes the construction of controlled-access facilities. But plaintiff has not offered any evidence whatsoever to support its argument that access would be readily obtainable. Perhaps we can infer that defendants could gain access to the long stretch of road adjacent to Parcel 2 and even along Parcel 1, but there may be serious problems about access at the narrow piece of highway between Parcels 3 and 4. Sandwiched between the railroad and the ramp to the bridge there may be safety factors which would prevent an entrance from being approved.
Plaintiff's entire case for special benefit to Parcel 4 depends on its accessibility to that road and in the absence of evidence we can only speculate that such access really exists as a practical matter.
As to the new highway frontage along the north side of Parcel 2, assuming that an industrial user could obtain permission from the Department to construct points of access to this highway, the tract as a whole gains no benefit since before the taking it already had access for the entire length of the River Road on the west side of the tract and along Highway 3089 on the east side of the Sunshine Bridge and the north side of Parcel 3. On cross examination plaintiff's appraiser admitted that most plant sites have a main entrance and that no particular reason exists for having a half mile of road frontage for one good plant entrance. This seems obvious and in the final analysis there is no proof that tracts 2 and 3 were enhanced because of the additional highway frontage afforded by this project or of any special benefit to these tracts. It was reasonable to conclude that these tracts lost 10% of their value and we find no error in the trial judge's conclusion in this regard.
As to Parcel 1, the evidence supports the conclusion that its highest and best use remains industrial and that it has not become an attractive commercial site. The reduction of its size and its distorted shape detract considerably from its value before the taking and the addition of highway frontage on its south adds nothing to its value. A reduction of 66% of its value is amply supported by the evidence.
Finally, Parcel 4 once an integral part of 2 and 3 is now virtually isolated. *391 The theory that this is now a choice industrial site because of the limited and theoretical access to the new road is not supported by the evidence and at best is speculative. The evidence supports a reduction of 50% of its value.
In State, Department of Highways v. Marks, 188 So.2d 653 (La.App.4th Cir. 1966), this Court concluded in a similar case that plaintiff had failed to carry its burden of proof of special benefit from increased highway frontage. There the Court was convinced that the defendant derived some benefit from the project but denied plaintiff's claim for a set off because of its failure to show just how much benefit would result. In the instant case plaintiff has not established by a preponderance of the evidence that defendants derived any special benefit to their property by access to this winding road through their property.
Accordingly, the judgment appealed from is affirmed.
Affirmed.
NOTES
[1] Tract "C" is composed of Parcels 2 and 3.